IN THE UNITED STATES DISTRICT COURT

OF THE DISTRICT OF MONTANA

MISSOULA DIVISION

*******

ALLIANCE FOR THE
WILD ROCKIES,

      Plaintiff,

-v-

UNITED STATES DEPARTMENT
OF AGRICULTURE, UNITED
STATES ANIMAL AND PLANT
HEALTH INSPECTION SERVICE,
an agency of the U.S. Department
of Agriculture, UNITED STATES
FOREST SERVICE, an agency of
the U.S. Department of Agriculture,
LESLIE WELDON, in her official
capacity as Regional Forester of
Region One of the U.S. Forest Service,
UNITED STATES DEPARTMENT
OF INTERIOR, UNITED STATES
FISH AND WILDLIFE SERVICE,
an agency of the U.S. Department of
Interior, UNITED STATES
NATIONAL PARK SERVICE, an

CV 11-76-M-CCL

OPINION & ORDER

agency of the U.S. Department of
Interior, and CHRISTIAN MACKAY,
in his official capacity as Executive
Director of the State of Montana
Department of Livestock,

      Defendants,

and

BILL MYERS, individually,

      Intervenor.

*******

     Now before the Court are cross-motions for summary judgment filed by the

Plaintiff Alliance for the Wild Rockies ("AWR") and the Federal Defendants.   For

the reasons set forth below, Plaintiff's motion is denied and Defendants' motion is

granted in its entirety.[1]

     AWR's motion for summary judgment asserts that the Federal Defendants'

failure to address the environment impacts on the threatened Yellowstone grizzly

---

     [1] Because oral argument will not be of material assistance, the Court orders
this matter submitted on the briefs.  D. Mont. Local Rule 78.1.

bear resulting from low-altitude helicopter bison hazing operations during spring and summer months is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  AWR specifically asserts that these activities violate the Endangered Special Act ("ESA"), 16 U.S.C. § 1531, *et seq.*, National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331, *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, *et seq.*, and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*

## I.  Background

### A.  Procedural Background.

Plaintiff Alliance for the Wild Rockies filed a Complaint against the Regional Forester, Leslie Weldon, of the U.S. Forest Service, and the United States Forest Service on May 18, 2011, "challeng[ing] the U.S. Forest Service's 2008 management plan and 2011 annual decision to permit recurring, low-altitude helicopter flights that harass Yellowstone grizzly bears, during spring and summer bear season, over National Forest lands in the Yellowstone Grizzly Bear Recovery Zone."  The Complaint focused on helicopter hazing occurring above the Gallatin

3

National Forest, particularly in the Hebgen Basin area.  In a matter pertinent to a

forthcoming Amended Complaint, AWR noted in the original Complaint that

seven days previous to filing it had provided the ESA requisite 60-day notice letter

to the Secretaries of the U.S. Department of Agriculture and the U.S. Department

of Interior, and also to Christian Mackay, Executive Officer of the Montana

Department of Livestock ("MDOL") as to AWR's ESA claims.  AWR also noted

that an Amended Complaint adding AWR's ESA claims would be filed after the

60-day period elapsed.  (Complaint, ECF No. 1, ¶ 4.)  However, AWR also sent an

amended 60-day notice of intent letter (adding two new defendants and new

allegations) just six days before filing the Amended Complaint.

The First Claim for Relief of the Amended Complaint asserts that the

helicopter hazing in May through July violates ESA Section 7, and required

reinitiation of consultation on the 2000 IBMP,[2] the 2008 Adaptive Management

---

[2]  The 2000 Intergovernmental Bison Management Plan ("IBMP") was the
culmination of a lengthy environmental impact study and protracted litigation
between the State of Montana and the National Park Service.  The 2000 IBMP was
not challenged in court, but the 2008 Adaptive Management Plan was challenged

Plan, and the Gallatin Forest Plan because "new impacts to grizzly bears . . . were not considered in the initial Biological Opinion and Incidental Take Statement." (ECF No. 19, Amended Compl. at 33.)  The Second Claim for Relief asserts that the helicopter hazing in May through July violates ESA Section 9, by "allowing and causing past and ongoing unpermitted take of threatened Yellowstone grizzly bears from harassment and harm related to helicopter hazing operations that cause grizzly bears to flee from normal biological activities."  (ECF No. 19, Amended Compl. ¶ 112.)

A motion for temporary restraining order was granted by this Court on May 14, 2012, because-- during the midst of this case, the principal question of which pending before the court is whether helicopter hazing is an appropriate means of moving the bison back into the Park--the MDOL began helicopter hazing.  Because the case was not yet ready for decision, the Court entered the

---

and approved by this Court in *Western Watersheds Project v. Salazar*, 766 F.Supp.2d 1095 (D. Mont. 2011), *aff'd*, 2012 WL 3756312 (9th Cir. 2012) (unpublished).

temporary restraining order and then allowed it to expire after the seasonal need for hazing ceased.  (ECF No. 59.)  The entry of the prior temporary restraining order should not be viewed as offering a gauge of the strength or weakness of the position of party to the case.

B.  Factual Background.

Yellowstone National Park ("the Park") lies within the Yellowstone Grizzly Bear Recovery Area.  Yellowstone bison migrate out of the Park each winter searching for lower ground with better forage opportunities.  Wandering Yellowstone bison thus annually enter the private and public lands bordering the Park, including the Gallatin National Forest.  Unfortunately, the Yellowstone bison herd is infected with brucellosis, which is a disease harmful to humans and cattle.  In order to maintain a wild and free-ranging bison population while yet avoiding the spread of the brucellosis disease to cattle grazing outside the Park, both the National Park Service and also the State of Montana have attempted to control annual winter bison migrations.  The State of Montana has attempted to control bison migrations from Yellowstone National Park using various methods,

6

including lethal removal of bison as they exit the Park and shipment of seropositive bison to slaughter.  Prior to 2000, the State of Montana's prevailing bison management method was to "capture and slaughter ... all bison crossing the north end and most bison crossing the west boundary of the park."  (NPS AR 6 at 365.)[3]  Since 2000, the State of Montana has at times utilized various hazing techniques, including helicopter hazing, to encourage bison to return to the Park following winter migration.  Neither the NPS nor the USFS issues any permit for the MDOL to conduct helicopter hazing activities.

## II.  Standard of Review

A.  <u>Summary Judgment Standard</u>.

A claim challenging agency action is addressed appropriately by summary judgment.  *See e.g. Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 938 (9th

---

[3]  ECF No. 30, Administrative Record, consisting of the Forest Service Administrative Record (USFS AR Doc. X at Y); National Park Service Administrative Record (NPS AR Doc. X at Y); Fish & Wildlife Service Administrative Record (FWS AR XX); and Animal and Plant Health Inspection Service Administrative Record (APHIS AR XX).  See also ECF No. 71, Supplement to the Administrative Record (Supp. AR XX).

Cir. 2010).  Summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The moving party bears the initial responsibility of presenting the basis for its motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The initial burden on plaintiff to inform the court varies "depending on whether the legal issues are ones on which the movant or the non-movant would bear the burden of proof at trial."  *Cecala v. Newman*, 532 F.Supp.2d 1118, 1132-33 (D. Ariz. 2007).  If the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting affirmative evidence as to the essential elements of its case such that no reasonable jury could find for the non-moving party.  *See Celotex*, 477 U.S. at 322-23, 106 S.Ct. 2548. If the movant meets its initial responsibility, the burden shifts to the non-movant to show a genuine issue as to a material fact. *Matsushita Elec. Indus. Co. v. Zenith*

8

*Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In deciding a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits.  Rule 56(c), Fed. R. Civ. P.  Evidence supplied by the opposing party is to be believed and all reasonable inferences drawn therefrom in favor of the opposing party.  *Matsushita*, 475 U.S. at 587.  However, in the context of cross-motions for summary judgment, each motion is to be treated independently on its own merits, and denial of one motion does not require the granting of another.  *See Regents University of Cal. v. Micro Therapeutics, Inc.*, 507 F.Supp.2d 1074 (N.D. Cal. 2007).

B.  APA Review Standard.

Through the Administrative Procedures Act, Congress has granted a limited waiver of sovereign immunity.  *Gallo Cattle Co. v. U.S. Dep/'t of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998).  A reviewing court may set aside final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This is a high threshold, and the

APA "does not allow the court to overturn an agency decision because it disagrees with the decision. . . ." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam).   The scope of the review is limited to the administrative record.  5 U.S.C. § 706.

### III.  Discussion

A.  <u>Statute of Limitations</u>.

The Record of Decision for the 2000 Final Environmental Impact Statement and Bison Management Plan for the State of Montana and Yellowstone National Park (NPS AR 9) was issued on December 20, 2000.  The six-year statute of limitations on the 2000 Joint Management Plan and the 2000 FEIS (NPS AR 9) has now long passed.  28 U.S.C. § 2401(a); see *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010).

B.  <u>Standing</u>.

There are three constitutional requirements that must be met to satisfy standing:  (1) an injury in fact, which is an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury

and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision.  United States Const. Art. 3, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

The Federal Defendants raise an argument as to AWR's standing to seek a remedy for their injury-in-fact.  Because AWR's claims focus on helicopter hazing as the source of the injury to grizzly bears, the Federal Defendants argue that the remedy sought--cessation of helicopter hazing--is not connected to the violations alleged against them.  The Court finds this argument to have merit.

This thread of lack of standing winds its way through all of the claims filed by AWR:  the ESA claims are weakened because no federal action underlies the complained-of activity;[4] the claim for additional NEPA supplementation is weakened because no new federal action has occurred since the original NEPA analysis was prepared; and the NFMA claim is weakened because the Forest

---

[4]  The one exception is Defendant APHIS, for it has in the past funded helicopter hazing by the Montana Department of Livestock and may do so again in the future.  However, this Court lacks jurisdiction over APHIS due to AWR's lack of proper notice to APHIS under the ESA.

Service issues no permit and takes no action to allow the State of Montana's helicopter hazing in the airspace over the Gallatin National Forest.[5]

AWR attempts to call federal agencies to task for allegedly violating federal

---

[5] Neither NPS nor USFS considers itself to have in any way permitted or authorized the State of Montana's hazing activities in Montana (whether in airspace over the Gallatin National Forest or in the airspace over Yellowstone National Park).  Montana's authority to conduct helicopter hazing is not given to Montana by the IBMP (which provides no legal or governmental authority *to* any IBMP partner but rather draws *its* legal authority from the powers of the government signatories themselves).  Rather, Montana's authority to conduct helicopter hazing arises from the legal authority of the State of Montana to manage its own wildlife:  "Montana has the right under its own police powers to protect the health, safety, and welfare of its inhabitants by removing possibly infected YNP bison that migrate into Montana."  *Intertribal Bison Co-op. v. Babbitt*, 25 F.Supp.2d 1135, 1137 (D. Mont. 1998) (*citing Fund for Animals, Inc. v. Lujan*, 794 F.Supp. 1015 (D. Mont. 1991)), *aff'd sub nom. Greater Yellowstone Coalition v. Babbitt*, 175 F.3d 1149 (9th Cir. 1999).  The fact that hazing--in general--is discussed in the 2000 Record of Decision (as cited by Plaintiff) merely underscores the fact that hazing has been addressed in prior NEPA analysis.  *(See* FS AR Doc 1 at 11.)  As to AWR's attempt to use the testimony of a witness (Mr. Mackay) to support its argument that helicopter hazing is a federally authorized program, the Court merely comments that legal conclusions are for the Court, not lay or expert witnesses.  *See Aguilar v. Int'l Longshoremen's Union Local #10*, 966 F.2d 443, 447 (9th Cir. 1992) (excluding legal expert's opinion as to legal matters because the opinion offered is an inappropriate subject for expert testimony).

environmental statutes, but the actual conduct complained of is the conduct of the State of Montana.  The Court concludes that AWR's standing to assert claims against the Federal Defendants is lacking in both causality and redressability.  However, the Court will continue with review of the  significant issues posed by the cross-motions.

C.  ESA Jurisdiction (60-day Notice of Intent to Sue).

Plaintiff issued a Notice of Intent ("NOI") to sue letter on May 11, 2011.  Just seven days later, on May 18, 2011, Plaintiff filed its Complaint alleging APA claims (violation of NEPA and NFMA).  Plaintiff issued its Amended NOI letter (adding FWS and APHIS as alleged ESA violators) on June 29, 2011.  Plaintiff filed an Amended Complaint adding the two ESA claims just fifteen days later, on July 14, 2011.

Plaintiff violated the 60-day notice requirement, *see* 16 U.S.C. § 1540(g)(2)(A)(1),[6] that prohibits commencing an action under ESA during a 60-

─────────────────

[6] The emergency exception to the 60-day notice requirement is not applicable here.  That exception is reserved for alleged failures of the Secretary to

day litigation-free window.  *See Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998) ("A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA.").

Essentially, AWR provided the requisite 60-day notice of intent to sue under the ESA, then almost immediately (seven days later) commenced suit against the Defendants under the APA for the same conduct, transaction, or occurrence that would later support the ESA claims of the Amended Complaint.  The same method of skirting the 60-day litigation-free window was attempted in *Proie v. National Marine Fisheries Service, et al.*, 2012 WL 1536756 (W.D. Wash. May 1, 2012), with the result that the district court dismissed the ESA claims because they related back to the date of the original commencement of the action and therefore violated the 60-day litigation-free window required by the ESA.  *Id.*

Citizen suit cases under the ESA ought not become merely superficial 60-day notice cases--because the case can be immediately commenced by filing of a

_____

perform nondiscretionary acts under Section 4 (listing, critical habitat, recovery planning) of the ESA. 16 U.S.C. § 1540(g)(2)(c).

14

complaint that will be amended in due course after the 60-day notice period has elapsed.  There was no notice period in this case during which the parties could have attempted to resolve their differences without the pressure of litigation and the hardening of positions so often caused by that pressure.  Because the federal waiver of sovereign immunity is conditioned on strict compliance with the ESA notice requirement, and that strict compliance was not observed in this case, this Court is without subject matter jurisdiction on the ESA claims as to the Federal Defendants.

Another significant defect in the original 60-day NOI is that it fails to name two of the Federal Defendants, APHIS and FWS, both of which should be dismissed without prejudice for lack of subject matter jurisdiction as to the ESA claims.

AWR asserts that it met the requirements of section 1540(g) because its original notice of intent to sue letter (ECF No. 5-1) was given at least 60 days prior to the filing of the ESA claims in the Amended Complaint.  AWR asserts that it has decided not to rely on the amended notice of intent to sue letter (ECF No.

74-2), which is essentially irrelevant.[7]

The Court is willing to accept AWR's disclosure that its amended 60-day Notice Letter is irrelevant and can and should be ignored (Pl.'s Response/Reply Brief, ECF No. 79 at 14), but that acceptance comes with consequences.  Focusing solely upon the original 60-day Notice Letter then, it appears that the original ESA Notice Letter was defective in that it failed to name two Federal Defendants (FWS and APHIS) and it failed to identify the 2009 IBMP Operating Procedures as a ground for the ESA Section 7 claim (First Claim for Relief).[8]  Because this Court therefore lacks jurisdiction over both of AWR's ESA claims against FWS and

_____

[7] On surreply, AWR argues that the Federal Defendants "argue for the first time in their reply brief that [AWR's] 'second notice . . . added new defendants and claims to the existing notice. . . .'" (Doc. 92-1, Br. in Supp. Mot. Leave  to File Surreply.)  This is not correct.  The Federal Defendants raised this point in their Brief in Support of the Cross-Motion for Summary Judgment.  (ECF No. 74 at 22.)

[8] The Court rejects AWR's surreply argument that merely naming the Secretary is sufficient notice and no notice need be given to the agency allegedly committing the ESA violation.  Plaintiff must give notice to the Secretary and to the alleged violator.  16 U.S.C. § 1540(g)(2)(A)(I).  A lack of notice would significantly limit the ability of the alleged violator to utilize the 60-day window to avoid ESA litigation, which is the purpose of the notice.

16

APHIS, the First and Second Claim for Relief of the Amended Complaint will be dismissed as against those Defendants.  The Court  also lacks jurisdiction over the First Claim for Relief as to all Defendants to the extent that the First Claim relates to the 2009 IBMP Operating Procedures.

D.  Mootness.

    1.  Termination of MDOL'S helicopter-hazing program.

There are two issues of mootness that need be addressed.  First, Defendant Christian Mackay avers that "[t]he State considers the helicopter hazing program ended, and has no plans to seek state funding of any such program."  (Aff. of C. Mackay, ECF No. 85-1, ¶ 7.)[9]  This assertion is premised upon the fact that "[i]n the spring of 2012, the State was informed by its federal IBMP partners that no federal funds could be used by the State for use in a helicopter hazing program to haze YNP bison back into YNP."  (ECF No. 85-1, ¶5.)

_____

[9] This Affidavit is submitted by Defendant Mackay in support of his response brief opposing AWR's Motion to Strike (ECF No. 80) [Mackay's] Notice of Joinder [in the Federal Defendants' Cross-Motion for Summary Judgment]. The Court will grant the Motion to Strike because the Notice of Joinder filed by Defendant Mackay and Intervenor Myers were filed two weeks past the filing deadline.

The Court concludes, however, that AWR's challenge to MDOL-conducted helicopter hazing of bison is not moot because the MDOL acknowledges that it stands ready to recommence helicopter hazing of bison.  This circumstance falls within an exception to the mootness doctrine, which is when a defendant voluntarily ceases the challenged action.  *See Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964-65 (9th Cir. 2007) (discussing three exceptions to mootness doctrine).  Therefore, Defendant Mackay's argument that Plaintiff's claims are now moot is both untimely and without merit, because the helicopter hazing program could be revived at any time.

2.  Re-initiation of Consultation.

A more serious mootness challenge to Plaintiff's § 7 ESA claim is made by the Federal Defendants, who announce in their Reply Brief that "the Federal agencies have reinitiated consultation."   (ECF No. 89 at 6.)  On September 20, 2012, Defendant National Park Service sought consultation with the U.S. Fish & Wildlife Service, pursuant to Section 7(a)(2) of the Endangered Species Act, regarding the reduction of whitebark pine seed and cutthroat trout and the impact

of these reductions on grizzly bear nutritional status,[10] as well as regarding hazing of Yellowstone bison during spring and early summer and how that may affect threatened grizzly bears. (Letter of Daniel N. Wenk, Supt. Yellowstone National Park, to Anne Vandehey, FWS, dated September 20, 2012, ECF No. 89-1.)

In support of his request for reinitiation of consultation, NPS Superintendent Wenk presented the FWS with a Biological Evaluation, entitled "Effects of Hazing Yellowstone Bison on Threatened Grizzly Bears," dated September 9, 2012.  (ECF No. 89-2, NPS 2012 Biological Evaluation.)  In its Biological Evaluation, NPS states that it believes that helicopter hazing of bison does not cause an adverse effect on Yellowstone grizzly bears under the ESA. (ECF No. 89-1 at 23, "Determination of Effect").  An amended Biological Evaluation, was transmitted to the FWS.  (ECF No. 97-2.)[11]

---

[10]  This reinitiation of consultation was independently obligated on grounds previously established and not among the claims raised by the Amended Complaint.  (FWS AR 000779-80.)

[11]  Due to a typographical error (that clearly did not comport with the rest of the document), this document states that "bison hazing operations constitutes an adverse effect under the federal Endangered Species Act of 1973, as amended." (ECF No. 89-2 at 4.)  NPS corrected the typographical error by issuing an amended Biological Evaluation six weeks later.  The Court will overlook such a

On November 2, 2012, a Letter of Concurrence was issued by the FWS Field Supervisor, Montana Ecological Services Field Office, Helena, MT, FWS. (ECF No. 97-1.)  The Letter of Concurrence by FWS states that "[w]e have reviewed your November 1 biological evaluation and concur with your determination that hazing operations conducted under the IBMP may affect, but are not likely to adversely affect grizzly bears."  (ECF No. 97-1 at 2.)

With the concurrence by FWS, the reinitiation of consultation is now completed.  The First Claim for Relief (ESA § 7) is therefore constitutionally moot.  *See Grand Canyon Trust v. Bur. of Reclamation*, 691 F.3d 1008, 1017-18 (9th Cir. 2012).  "[C]ourts should not examine claims that become moot because of changed factual circumstances during the litigation."  *SW. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 82 F.Supp.2d 1070, 1079 (D. Ariz. 2000) (citing *Humboldt Cnty. v. United States*, 684 F.2d 1276, 1283-84 (9th Cir. 1982)).

The Court distinguishes *Forest Guardians v. Johanns*, 450 F.3d 455 (9th

---

minor mistake in the administrative record.  *See Center for Sierra Nevada Conservation*, 832 F.Supp.2d 1138, 1149 (E.D. Cal. 2011) (appropriate to "overlook minor gaffes in the record").

Cir. 2006), because that case involved a grazing permit with a term remainder during which the Forest Service had agreed to perform certain future actions (*i.e.*, monitoring of FWS guidance criteria governing livestock grazing).  In *Johanns*, the Forest Service repeatedly violated its agreement with the FWS to annually monitor the grazing allotments under Forest Service permit.  In this case, neither NPS nor the Forest Service issue any permit for Montana's helicopter hazing program and no federal agency has entered into any agreement to monitor Montana's helicopter hazing program.  This case does not involve "a continuing violation or practice...."  *Johanns*, 450 F.3d at 462 (quoting *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724 (10th Cir. 1997)).  Thus, the federal agencies in the instant case having performed the sought-after reinitiation of consultation (which, significantly, was independently required by other grounds entirely), there is no future action by the federal agencies that might still be subject to declaratory judgment, as was the case in *Johanns*.  Given this circumstance, the Court concludes that AWR's ESA § 7 claim against the Federal Defendants is moot.

E.  <u>ESA Claims</u>.

1.  ESA § 7 Claim.

It is the State of Montana that actually conducts helicopter hazing.  The Federal Defendants assert that they were not required to consult with FWS regarding Montana's helicopter hazing because the State of Montana has a vested right to manage its wildlife, and the helicopter hazing is conducted entirely by the State of Montana.  As such, it is a non-Federal action that is not subject to ESA Section 7.  The Federal Defendants deny that they have affirmatively authorized funded, or controlled the State's use of a helicopter, and they therefore assert that the Section 7 reinitiation of consultation is not required.

However, the Federal Defendants admit--as they must--that in the <u>past</u> APHIS has funded the State's use of helicopters for hazing.  However, the Federal Defendants point to a 2012 cooperative agreement between APHIS and MDOL (ECF No. 52-1, Decl. Dr. E. Herriott, Exhibit A), which now establishes that APHIS will not fund State-operated helicopters for hazing purposes.  The Court cannot predict whether APHIS will fund the helicopter hazing program in the future, and can only note that in the past the only Federal Defendant that has "authorized, funded, or carried out"  helicopter hazing activity is APHIS.  As

previously stated, however, the ESA claims against APHIS must be dismissed without prejudice for AWR's failure to provide the requisite 60-day notice.  Any funding of MDOL helicopter hazing in the future by APHIS would carry with it the ESA § 7 procedural and substantive obligations.

Having argued first that helicopter hazing is not a federal action requiring agencies to consider ESA Section 7 obligations, the Federal Defendants also respond directly to the claim that they have violated section 7 of the ESA by pointing out that in 2000 they did prepare a biological assessment that analyzed whether the IBMP activities would have an adverse effect on the grizzly bear. (ECF No. 74 at 14;  FWS AR 00646-52.)  The outcome of that consultation was a determination that bison hazing operations were not likely to adversely affect grizzly bears.  FWS reviewed the NPS biological assessment and also independently evaluated whether the IBMP activities would have an adverse effect on grizzly bears.  FWS issued a concurrence stating that the IBMP activities were not likely to adversely affect the listed grizzly bear in the Greater Yellowstone Ecosystem.  The Federal Defendants conclude that they did indeed comply with the procedural and substantive requirements of ESA Section 7.

Furthermore, on December 3, 2012, the FWS concurred in the conclusion of the NPS 2012 Biological Evaluation, to wit, that bison hazing activity (including by means of helicopter) in May and June is not likely to adversely affect Yellowstone grizzly bears.  The FWS agreed that "the Yellowstone grizzly bear population is robust and expanding its range[,]" and there has been no reduction in the number of bears or in the number of female bears with cubs.  (ECF No. 97-1 at 2-3.)  The Court agrees with the Federal Defendants that AWR's ESA Section 7 claim is now moot.

2.  ESA § 9 Claim.

Neither lack of standing nor mootness arguments appertain to AWR'S § 9 ESA taking claim as to Defendant Christian Mackay, Executive Director of the MDOL.  Defendant Mackay orders MDOL's helicopter hazing when he deems it appropriate.  Therefore, there are no questions as to causality and redressability as to him.  In addition, AWR's § 9 ESA claim is not moot because Defendant Mackay makes clear that if APHIS funding could be obtained, MDOL would recommence helicopter hazing.  (ECF No. 85-1, ¶ 10.)

Section 9 of the ESA prohibits the taking of an endangered or threatened

24

species: "it is unlawful for any person subject to the jurisdiction of the United

States to (B) take any such species within the United States. . . ."  16 U.S.C.

§1538(a)(1)(B).  A citizen suit claim under § 9 may be filed against *any person*,

which is defined by the ESA to include any *officer* or *employee* of a State.  16

U.S.C. § 1532(13).  The ESA defines "take" to include "harass."  16 U.S.C.

§ 1532(19).  "'Harass' is defined as an intentional or negligent act . . . which

creates the likelihood of injury to wildlife by annoying it to such an extent as to

significantly disrupt normal behavioral patters which include, but are not limited

to, breeding, feeding, or sheltering.'"  (ECF No. 68 at 23, quoting 50 C.F.R.

§ 17.3.)  In addition, government officers may be held responsible for a take

"when the officers authorized activities undertaken by others that caused take."

(ECF No. 68 at 24 (quoting *Seattle Audubon Soc'y v. Sutherland*, 2007 WL

1577756 (W.D. Wash. May 30, 2007)).

While the Eleventh Amendment generally bars actions against states or their

agencies, suit can be brought against state officials seeking declaratory and

injunctive relief for violation of federal law.  *See Coeur d'Alene Tribe of Idaho*,

521 U.S. 261, 269, 117 S.Ct. 2028, 2034, 138 L.Ed.2d 438 (1997).  Thus, AWR's

§ 9 ESA take claim is addressed not only to the Federal Defendants but also to

Christian Mackay, the Executive Director of the Montana Department of

Livestock.  While the Federal Defendants can show that they do not conduct,

authorize, or fund helicopter hazing and thus are not responsible for any § 9 ESA

take violation, Defendant Mackay is not in the same position.[12]  (The Court

disregards AWR's claim against APHIS because it is clear that the requisite 60-

day notice was not given to APHIS.)

Plaintiff AWR claims that a "take" occurs when Yellowstone grizzly bears

are harassed by the bison helicopter hazing to the point of displacing bears from

their spring feeding activities.  One incident of a purported take-by-displacement

was filmed on May 12, 2010.  The video of this incident shows a helicopter flying

over an animal that could be a grizzly bear, causing the bear to run away.  (ECF

---

[12]  This is not true as to APHIS, which has historically funded MDOL's
helicopter hazing program.  APHIS has voluntarily ceased to fund helicopter
hazing at present, but could potentially reinstitute funding in the future.  As to
APHIS, therefore, the prohibition on *funding* actions that constitute violations of
the ESA may apply.  *See* 16 U.S.C. § 1536(a)(2); *see also* 16 U.S.C. § 1638(g) ("It
is unlawful for any person subject to the jurisdiction of the United States to
attempt to commit, solicit another to commit, or *cause to be committed*, any
offense defined in this section.") (emphasis added).

No. 5, Exhibit 17, video filed conventionally.)  There is, however, no video footage (nor any allegation) that the bear was engaged in any feeding activity, whether before, during, or after its contact with the helicopter.  According to the videographer, this video was taken on the Horse Butte Peninsula of the Gallatin National Forest.

The Federal Defendants flatly deny either that mere displacement (*i.e.*, moving a bear from one spot to another by any means) can constitute a take or that this particular video shows a grizzly bear displaced from feeding activities.  In support, Dr. Chris Servheen, the FWS Grizzly Bear Recovery Coordinator, asserts that the video does not demonstrate a take:

> In summary, in my experience as a professional grizzly bear biologist for 37 years, I find no evidence in this video that this bear is harmed or 'taken' in any way.  Occasional helicopter hazing of bison is not an issue for grizzly bear recovery and conservation and it will not harm or harass bears from habitats or result in any measurable impact on the bears or their young.

(ECF No. 71; Supp. AR 1415-16, C. Servheen Memo. to A. Vandehey, dated 8/22/12.)  Dr. Servheen could not positively identify the animal in the video as being a grizzly bear, but even if it were, he believes that "grizzly bears are well

adapted behaviorally and physiologically to use flight as a normal response to being startled." (Supp. AR 1415.) Such a startle/flight response is "likely a daily event in the lives of most bears and in fact in the lives of all wildlife species." (Supp. AR 1415.) Dr. Servheen concludes that "[t]he video presents no indication that this short loping run of the bear in the video would in any way harm this bear or result in adverse effects to this individual's health, and even less indication that the animal would suffer a significant impairment of breeding, feeding or sheltering, or injury or death because of this." (Supp. AR 1415.)

The Court agrees with the Federal Defendants that there is simply no evidence in this record that MDOL's helicopter hazing of bison constitutes a "take" of the Yellowstone grizzly bear within the meaning of ESA Section 9. There is no evidence of harassment causing a disruption of normal behavior patterns, including breeding, feeding, or sheltering. 50 C.F.R. § 17.3. All the evidence shows that the helicopter hazing of bison is infrequent and of limited duration. The evidence shows that the IBMP partners attempt to avoid helicopter hazing in areas where grizzly bears are present or in designated closure areas where they are likely to be present. A recent study indicates that bears are not

28

adversely affected by helicopters.  (Supp. AR 623-31.)  Importantly, all current

indicators portray a Yellowstone grizzly bear population that is healthy and

increasing in numbers.  The historically infrequent instances of contact between

helicopters hazing and grizzly bears are *de minimis* and fail to rise to the level of a

take.  There is clearly no need for an incidental take permit under all these

circumstances.

The 2012 Biological Evaluation ("2012 BE") merely underscores the

insufficiency of the evidence put forward by AWR to support its § 9 take claim.

The 2012 BE concludes that neither the reduction in whitebark pine and cutthroat

trout nor the IBMP itself has contributed any displacement, injury, or other

adverse demographic effect to grizzly bears.  (ECF No. 97-2 at 4, 12, 23.)  The

overall positive contribution of the IBMP vis-a-vis grizzly bears is to increase the

available number of bison carrion for scavenging by grizzly bears.  (ECF No. 97-2

at 12.)  One of the main reasons that the helicopter hazing has not shown an effect

upon the grizzly bears is that the area of hazing operations, outside the boundaries

of YNP, is not particularly significant to the Yellowstone grizzly, where grizzly

bear abundance is "modest" during May and June.  (ECF No. 97-2 at 18.)  "[T]he

Horse Butte area west of the park and the lowland valley area of the Gardiner

basin north[13] of the park, where most bison hazing activities occur, are considered

areas lacking distinct grizzly bear population centers or highly suitable habitat,

though some habitat exists and grizzly bears may be present occasionally [citation

omitted]."  (ECF No. 97-2 at 9.)  There are no known grizzly bear dens in the

hazing areas.  (ECF No. 97-2 at 11.)  In summer, YNP grizzly bears shift their

focus of feeding activity to the east and southeast of the western management area.

(ECF No. 97-2 at 11.)

The 2012 BE adopts the analysis criteria utilized by the "Helicopter

Handbook" created by the Montana/Northern Idaho Level I Terrestrial Biologists

Team (FS AR 99).  (ECF No. 97-2 at 6.)  The 2012 BE also recognizes that

mitigation actions are being utilized to alleviate any impact on grizzly bears from

helicopter hazing, such as halting operations upon sighting a grizzly bear.  (ECF

No. 97-2 at 21.)

---

[13]  Helicopter hazing has not been utilized on the northern boundary of the
Park because that area is "open valley lowland habitat" that lends itself to bison
hazing from horseback.  (ECF No. 97-2 at 16.)

The 2012 BE concludes that

> [a]s a result, the NPS believes that bison hazing activities do not
> cause injury, decrease, productivity, or significantly interfere with
> normal behavior patterns of grizzly bears such as breeding, feeding,
> or sheltering.  Furthermore, occasional disturbances of grizzly bears
> during bison hazing operations that cause them to run short distances
> likely have insignificant energetic costs with a lengthy summer and
> autumn period for recovery.

(ECF No. 97-2 at 7.)  This conclusion has solid support in all of the empirical data

showing that the YNP grizzly bear population is thriving (*e.g.*, by the fact the

population is at *double* the annual recovery target for females-with-cubs, *see* 2012

BE (ECF No. 97-2 at 10)),[14] and is also supported by the FWS concurrence.  This

agency conclusion is consistent with the Helicopter Handbook, which states that

"[i]f the duration of helicopter use is short and the effects are relaxed almost

immediately . . ., then low altitude helicopter operations are <u>generally</u> "not likely

---

[14] Other positive indices are the increasing number of Yellowstone grizzly
bear females producing cubs, the total number of cubs produced annually, and
total estimates of the Yellowstone grizzly bear population.  (ECF No. 97-2 at 12.)
Expansion of occupied range is another positive indicator of the overall abundance
of the Yellowstone grizzly bear population.  (*Id.*)  No decreases in grizzly bear
population have been noted within the individual Bear Management Units that are
occupied by bison (11 of 28 BMUs in the Yellowstone Recovery Area) during
1991 through 2011.  (ECF No. 97-2 at 13.)

to adversely affect" (NLAA) grizzly bears."  (FS AR 99:6 (emphasis in original).)

Finally, besides making its detailed analysis and conclusions, the 2012 BE reiterates that it is the State of Montana, not federal agencies, that conducts helicopter hazing "each May and June in the western management area".  (ECF No. 97-2 at 8.)  "The federal agencies involved with the IBMP do not authorize (*i.e.*, permit[15]), fund,[16] or carry out hazing of bison with helicopters."  (ECF No. 97-2 at 8.)  The federal agencies have no ability to control the MDOL's activities in airspace either over National Forest lands or over Yellowstone National Park.  (ECF No. 97-2 at 8.)

In addition, there remains the objection to the lack of 60-day notice provided to Defendant Mackay by commencement of this lawsuit seven days after notice was given.  As stated earlier, this Court believes that this failure of notice

---

[15]  The record does not disclose any instance of helicopters landing on the Gallatin National Forest during bison hazing operations.  Helicopter refueling takes place at the West Yellowstone Airport, near West Yellowstone, Montana. (Supp. AR 00723.)

[16]  APHIS curtailed funding during the pendency of this suit, and had it not done so AWR's §7 ESA would have applied to APHIS (assuming the claim could survive the 60-day notice challenge discussed *supra*).  That said, the 2012 BE and FWS concurrence have laid to rest the central concerns of the § 7 ESA claim.

32

leaves the Court without jurisdiction to entertain the § 9 ESA claim against Defendant Mackay, but even if that were not true the outcome would still be the same.  Given the insufficient evidence put forward by AWR as to the § 9 take claim under the ESA, the Court cannot find that AWR has standing as to its other claims (§7 ESA, NEPA, NFMA) because the redressability aspect of AWR's standing is lacking as to those claims.  Even were AWR to prevail on any or all of its non-take claims, the failure of the take claim itself means that a remand to the agencies for further environmental review, analysis, and consultation would not be accompanied by an injunction against Defendant Mackay to cease helicopter hazing.  Thus, a favorable decision on any of the non-take claims would not result in the granting of the relief actually requested by AWR in its Amended Complaint.

F.  NEPA Claim.

AWR does not demonstrate that it has presented a NEPA claim that is redressable by this Court in this case, and AWR therefore lacks standing as to this claim.  Out of an abundance of caution, the Court nevertheless explains why the result would not be otherwise on the merits.

The twin goals of the National Environmental Policy Act (NEPA) are to

33

require federal agencies to take a hard look at the environmental consequences of their proposed actions and to inform the public that the agencies have indeed considered the relevant environmental concerns. *See California v. Block* 690 F.2d 753, 761 (9th Cir. 1982) (*citing Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).  After an environmental impact statement has been prepared, either a substantial change in the proposed action or significant new information may require further NEPA analysis.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

The type of change in the proposed action that requires further NEPA analysis is a substantial change affecting the environment.  The type of new information that requires further NEPA analysis is new information that affects the quality of the environment "in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374.  The Court's review of an agency's exercise  of informed discretion not to supplement NEPA documentation is deferential. *Price Road Neighborhood Ass'n v. Dept. of Transp.*, 113 F.3d 1505, 1509-12 (9th Cir. 1997) (internal citation omitted).

Plaintiff argues that the change in the proposed action that requires further

NEPA analysis is the change in the timing of helicopter hazing from the grizzly bears' denning season to grizzly bears' post-denning season. The 2000 FEIS states that "the average [hibernation] emergence date for bears is in March[,]" which is approximately late winter and early spring. (FS AR 2 at 568.) Naturally, because this is only an average, some bears emerge earlier and some later.[17] Plaintiff AWR apparently believes that the entire 2000 FEIS was predicated on the assumption that bears would be denning while hazing takes place. Plaintiff asserts that the 2000 FEIS "assumes that grizzly bears will not be present in the same area as hazing operations. . . ." (ECF No. 68 at 29.)

However, a close reading of the FEIS does not support Plaintiff's argument. The FEIS merely notes that the *majority* of management activities will take place while bears are in their dens (FS AR 2, Vol. I at 585), while still acknowledging "the possibility of overlap in the fall and spring when bears are not in dens. . . ." (FS AR 2, Vol. I at 585.) It is true that the 2000 Biological Assessment notes that *capture* facility activities (at Horse Butte, Duck Creek, and Stephens Creek) occur

---

[17] Ninety percent of Yellowstone grizzly bears have emerged from their dens by the first week in May. (ECF No. 97-2, 2012 Biological Evaluation, at 17.)

during grizzly bear hibernation.  (FWS AR ECF No. 70 at 686.)  However, capture facility activities are not germane here.  Furthermore, this statement cannot be expanded to mean that the IBMP NEPA documents contemplate that all bison management activities take place during grizzly bear hibernation.

It is a given in the FEIS that some bison management practices, such as hazing, will occur long after grizzly emergence from hibernation because the FEIS focuses on a May 15 haze-back date.  (FS AR 2, Vol. I at 188.)  "Bison would be hazed back into the park by the agencies on or near May 15.  The exact date would be set annually by the agencies and would be based on weather, the feasibility of returning bison to the park through hazing, and other factors such as population size."  (FS AR 2, Vol. I at 188.)

Thus, the FEIS contemplated that hazing would be conducted on a flexible schedule and was never tied to denning or absence of grizzlies.  In fact, the Joint Management Plan always contemplated hazing on the western YNP boundary in late spring and summer:  "Between May 15 and when cattle are removed from the area in the fall, limited hazing of bison will occur in Zone 1 [YNP] if needed to maintain spatial separation."  (NPS AR 9, YELL AWR 002663, ROD at 26.)

The FEIS clearly demonstrates a consideration of hazing when bears are present because the FEIS notes the policy that "hazing operations would cease if there was evidence of grizzlies being active in the area."  (FS AR 2, Vol. I at 594.) That this is still the IBMP policy is evidenced by the written instruction for bison hazing given to helicopter pilots.  (Supp. AR 00723 ("Terminate helicopter operations as directed by Horse Team Leader or if hazing operations directly affect grizzly bear activities.  Report all incidents to West District Ranger [].").) On the one hand, although neither the IBMP nor the FEIS approves  of helicopter hazing in the presence of grizzly bears, on the other hand, neither document is premised on the idea that hazing will only take place during grizzly bear denning season.  Furthermore, it remains a fact that denning takes place at higher elevations inside the Park, not in the areas where helicopter hazing occurs, at lower elevations, and mainly outside the Park.  (FS AR 2, Vol. II at 427.)

Although recently helicopter hazing has been more frequently conducted in late spring and early summer than was the case in the years following the 2000 FEIS, this is not a substantial change in the federal action under the IBMP. Contacts between helicopter hazing and grizzly bears continues to be few in

37

number and brief in duration, and the Court finds that the presence of grizzly bears during helicopter hazing operations had already been considered and analyzed by the existing NEPA documentation.

Plaintiff also argues that new circumstances or information should result in further NEPA analysis. The new information acquired is the documented presence of grizzly bears during helicopter hazing activities.[18] The Court does not find this video to be significant within the meaning ascribed by NEPA and the Council on Environmental Quality (CEQ) regulations. Neither the context nor the intensity of the video lends to a finding of significance. *See* 40 C.F.R. § 1508.27.

_____

[18] In its surreply brief, AWR also argues that the NPS decision to prepare the 2012 Biological Evaluation actually strengthens AWR's NEPA claim by its purported admission that "new information" has become available necessitating further NEPA analysis. A § 7 reinitiation of consultation is not to be judged by the NEPA standard, however, which is more narrow. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996) ("Where, as here, there is no 'agency action' under what is probably the more liberal standard of the ESA, there is no 'major federal action' under the more exclusive standard of NEPA."). Furthermore, the 2012 Biological Evaluation indicates, quite convincingly, that no further NEPA analysis is required. *See Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 529 (9th Cir. 1994) (decision not to prepare SEIS was reasonable *because* DOT reinitiated consultation with FWS on a biological opinion). The Court finds this surreply argument to be without merit.

The context of helicopter hazing of bison is that it is of low frequency and brief duration.  Helicopter hazing activities are terminated in the presence (within 200 meters of the hazing pathway) of a grizzly bear.  (IBMP 565; ECF No. 97-2 at 46, NPS Biological Evaluation.)  To the extent that there have been instances of contact between helicopter hazing activity, such contacts have been few and brief.

The general context of helicopter hazing is that it is used at times as a substitute for lethal removal of bison, so the general context of this activity is that this is a highly beneficial activity from the point of view of bison preservation.

As to significance and intensity considerations, the overall impact on grizzly bears appears to be relatively neutral (neither beneficial nor adverse).  An FWS grizzly bear expert who has viewed this video has stated that

> "I find no evidence in this video that this bear is harmed or "taken" in any way.  Occasional helicopter hazing is not an issue for grizzly bear recovery and conservation and it will not harm or harass bears from habitats or result in any measurable impact on the bears or their young."

(Supp. AR 1415-16, Memo. from Dr. C. Servheen to A. Vandehey.)  The impact of helicopter hazing is to improve public health or safety by safely removing bison from areas where they do not belong and by avoiding more dangerous hazing

methods (*e.g.*, hazing on horseback).  Helicopter hazing in proximity of YNP may be controversial--but not because of its impact on grizzly bears--but it is certainly less controversial than shooting bison to remove them from areas where the State of Montana has determined bison do not belong.  Helicopter hazing does not establish a precedent for any future actions or represent a decision in principle about any future consideration.  Helicopter hazing is not cumulatively significant in its impact on grizzly bears.  Helicopter hazing does not cause the loss or destruction of scientific, cultural, or historical resources.  Environmental analysis has concluded that helicopter hazing may affect, but is not likely to adversely affect listed grizzly bears.  (ECF No. 97-2 at 4.)  Helicopter hazing does not threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment.  *See* 40 C.F.R.  § 1508.27(b)(1)-(10).

Thus, the severity of the impact of helicopter hazing on grizzly bears appears to be low.  There being no context of significance vis-a-vis the Yellowstone grizzly bear and low severity of impact on the grizzly bear, the Court concludes that there is no new circumstance or information that requires a supplemental EIS as demanded by Plaintiff.

G.  NFMA Claim.

The National Forest Management Act requires the Forest Service to develop a forest plan for every forest within its jurisdiction.  16 U.S.C. § 1604(a). Following development of the plan, all projects within the forest must comply with the NFMA and be consistent with the forest plan.  16 U.S.C. § 1604(I); *see Lands Council v. McNair (Lands Council II)*, 537 F.3d 981, 989 (9th Cir. 2008) (en banc).  The court defers to the agency's interpretation of its own forest plans, unless the interpretation "is plainly inconsistent with [a forest plan]."  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). Factual disputes implicating substantial agency expertise are decided under the arbitrary and capricious standard, but legal issues are reviewed under the reasonableness standard.  *See Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 666-67 (9th Cir. 1998).  An agency decision can be set aside

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Lands Council II*, 537 F.3d at 987 (internal quotation marks omitted).

41

Although helicopter hazing does often occur in May and June in the airspace above the Gallatin National Forest, a State of Montana helicopter need never touch down on the Gallatin National Forest to conduct this activity.  (*See e.g.*, Supp. AR 00723 (noting the operating/refueling base is the West Yellowstone Airport).)  This is a significant point that distinguishes this case from the helicopter-logging cases cited by Plaintiff, because in those cases the U.S. Forest Service approved the helicopter-logging project and issued a permit for it.  Despite these circumstances, wherein the U.S. Forest Service carries out no project utilizing helicopter hazing, conducts no helicopter hazing, and issues no permit to allow helicopter hazing, Plaintiff argues that the U.S. Forest Service should prepare a supplemental EIS to ensure that these activities conducted on the Gallatin National Forest are compatible with grizzly bears.  Plaintiff asserts that helicopter hazing may affect grizzly bears and does have an adverse and "noncompatible effect" on grizzly bears, putting the Forest Service in violation of its Forest Plan.

It is Plaintiff's burden to show an NFMA violation.  *See, e.g., Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995); *Envtl. Info. Prot. Ctr. v. Blackwell*, 389

42

F.Supp.2d 1173, 1220 (N.D. Cal. 2004); *S. Utah Wilderness Alliance v. U.S. Forest Serv.*, 897 F.Supp. 1394, 1397 (D. Utah 1995).  Plaintiff states that "[w]ithout an EIS, it is impossible to determine whether the Forest Service is meeting all of these grizzly bear-related Forest Plan obligations."  *(*Pl.'s Summ. Judg. Brief, ECF No. 68 at 25.)  Impossible or not, it is Plaintiff's burden to show that the Forest Service is violating some provision of the Forest Plan, and Plaintiff has failed to show that the Forest Service is required to supplement the existing EIS under NEPA.  Specifically, Plaintiff has failed to show that helicopter hazing adversely impacts grizzly bears--whether directly, indirectly, or cumulatively. Plaintiff has merely shown, at most, that a grizzly bear will notice and be startled by a helicopter overhead, but such a minor event does not rise to the level of an adverse impact nor does it even raise a concern of an adverse impact.  (Supp. AR 1415-16, Servheen Memo., 8/22/12.)

Moreover, the U.S. Forest Service is not responsible for the MDOL's action at issue here:  the U.S. Forest Service does not conduct helicopter hazing, does not fund it, does not permit it, and does not advise it.  The most that can be said is that the Forest Service often provides a law enforcement officer on the ground during

*ground* hazing operations (*e.g.*, hazing by horseback).  In fact, as the 2000 Record of Decision for the IBMP acknowledges, "[t]he Forest Services recognizes that the State of Montana has *primary* management responsibilities for livestock disease and wildlife on national forest as well as private lands surrounding the Park." (USFS AR 1 at 8-9 (emphasis added).)  In other words, the State of Montana does not need the permission of the U.S. Forest Service to haze bison by helicopter from the airspace above the Gallatin National Forest in the State of Montana.

## IV.  Conclusion

Based on the administrative record, the Court finds that the Defendants' actions are not arbitrary and capricious under the APA.  The Court is without jurisdiction to decide the ESA claims for lack of 60-day notice of intent to litigate. Even if this Court had jurisdiction over the ESA claims, the Court would find that AWR lacks standing as to the non-take claims for an insufficient showing of causality and redressability between the Federal Defendants' alleged violations/alleged harm (causality) and between the alleged harm/relief sought (redressability).  If the Court had jurisdiction over the ESA claims, the Court would find that the § 7 claim is now moot and AWR has presented insufficient

evidence to support a finding of "take" under § 9.

To the extent that the Court has jurisdiction over the NEPA and NFMA claims (*i.e.*, to the extent that AWR overcomes the standing hurdle), the Court finds that AWR makes an insufficient showing that the federal agencies' (1) failure to supplement existing NEPA documentation and (2) failure to prevent helicopter hazing by the MDOL constitute actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Accordingly,

IT IS HEREBY ORDERED that AWR's Motion for Leave to File Surreply (ECF No. 91) is GRANTED, and AWR's Motion to Strike Notices of Joinder (ECF No. 80) is GRANTED.

IT IS FURTHER ORDERED that Federal Defendants' Cross-Motion for Summary Judgment is GRANTED, AWR's Motion for Summary Judgment is DENIED, and the Amended Complaint is DISMISSED as to all Defendants and Intervenor Myers, as follows:

1.  As to Federal Defendants APHIS and FWS, Counts I and II are dismissed without prejudice on the ground of lack of jurisdiction (pursuant to 16

U.S.C. § 1540(g)) and justiciability, and Counts III and IV are dismissed on grounds of justiciability (standing).

2. As to the remaining Federal Defendants, Count I is dismissed on grounds of lack of jurisdiction (pursuant to 16 U.S.C. § 1540(g)) and justiciability (standing and mootness), Count II is dismissed on grounds of lack of jurisdiction (pursuant to 16 U.S.C. § 1540(g)) and justiciability (standing), and Counts III and IV are dismissed on ground of lack of justiciability (standing).

3. As to Defendant Christian Mackay, Counts I and II are dismissed on grounds of lack of jurisdiction (pursuant to 16 U.S.C. § 1540(g)) and justiciability (mootness), and Counts III and IV are dismissed on the ground of justiciability (standing).

Let judgment enter.

DONE and DATED this 26th day of March, 2013.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE

46