IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

*******

ALLIANCE FOR THE WILD ROCKIES,                    CV 11-76-M-CCL

   Plaintiff,

     vs.

UNITED STATES DEPARTMENT                               ORDER
OF AGRICULTURE, UNITED
STATES ANIMAL AND PLANT
HEALTH INSPECTION SERVICE,
an agency of the U.S. Department
of Agriculture, UNITED STATES
FOREST SERVICE, an agency of
the U.S. Department of Agriculture,
LESLIE WELDON, in her official
capacity as Regional Forester of
Region One of the U.S. Forest Service,
UNITED STATES DEPARTMENT
OF INTERIOR, UNITED STATES
FISH AND WILDLIFE SERVICE,
an agency of the U.S. Department of
Interior, UNITED STATES
NATIONAL PARK SERVICE, an
agency of the U.S. Department of
Interior, and CHRISTIAN MACKAY,
in his official capacity as Executive

Director of the State of Montana
Department of Livestock,

    Defendants,

and

BILL MYERS, individually,

    Intervenor.

*******

Before the Court is Plaintiff's "Motion for Attorneys' Fees, Expert Witness Fees, and Other Costs & Expenses Under the Endangered Species Act" (Doc. 125). The matter came on regularly for hearing on June 23, 2016, at which time the Court received excellent argument from Ms. Coleman and Mr. Stutz for the Defendants and also from Ms. Smith and Mr. Bechtold for the Plaintiff. Having received the arguments and reviewed the briefs and voluminous documentation provided by the parties, the Court is prepared to rule.

Plaintiff requests $253,459.13 in attorney fees, $3,960.00 in consultant/research assistant fees, $4,785.00 in expert witness fees, and $3,343.30 in non-taxable costs, for

a total request of $265,547.43. The motion was originally submitted by Plaintiff Alliance for the Wild Rockies ("AWR") to the Ninth Circuit Court of Appeals following conclusion of its appeal, but the motion was ultimately referred to this Court for decision. The motion is vigorously opposed by the federal and state Defendants. The Montana Defendant asserts that no fees or costs should be assessed against it, and this Court agrees because AWR did not succeed on any claim against the State of Montana. The federal Defendants similarly urge that no fees or costs be assessed, but in the alternative the federal Defendants request that no more than $13,500 be assessed in attorney fees.

Plaintiff's Amended Complaint and Relief Sought

In its Complaint, AWR challenged the USFS's decision to allow helicopter hazing of bison on USFS land. AWR asserted in its First Claim for Relief that the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, was violated by National Park Service when it failed to reinitiate consultation with the U.S. Fish & Wildlife Service as to the 2000 bison management plan and the Gallatin Forest Plan. AWR claimed that these existing documents were based upon false and outdated assumptions and that

under current conditions the plan of operations for helicopter hazing was likely to adversely affect the Yellowstone grizzly bear (which is currently a threatened species under the ESA).  Changes in the circumstances of Yellowstone grizzlies that were claimed by AWR in their Amended Complaint, included helicopter hazing occurring during the post-denning season (as opposed to denning season), and reductions to and interference with post-denning nourishment due both to the mechanized activity and other threats to four primary food sources (ungulate meat, whitebark pine seeds, cutthroat trout, and army cutworm moths).

In its Second Claim for Relief, AWR asserted that the helicopter hazing harassed Yellowstone grizzly bears and constituted a take and harassment within the meaning of the Endangered Special Act ("ESA"), 16 U.S.C. § 1533(d), § 1538(a), § 1532(19).

In its Third Claim for Relief, AWR asserted a violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and claimed that the federal Defendants had ignored significant new circumstances (low-altitude recurring helicopter hazing operations (May-July)) and failed to prepare a supplemental NEPA analysis of the effects of recurrent helicopter-hazing upon Yellowstone grizzly bears.

In its Fourth Claim for Relief, AWR asserted a National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, et seq., violation by USFS's authorization of helicopter hazing over the Gallatin National Forest without conducting a necessary analysis required by the Forest Plan.

The relief sought by AWR is as follows:

A.  Declare that low-altitude helicopter hazing operations over occupied Yellowstone grizzly bear habitat in May, June, and July violate the law;

B.  Enjoin implementation of low-altitude helicopter hazing operations over occupied Yellowstone grizzly bear habitat in May, June, and July;

C.  Award Plaintiff its costs, expenses, expert witness fees, and reasonable attorney fees under the ESA and EAJA; and

D.  Grant Plaintiff any such further relief as may be just, proper, and equitable.

(Doc. 19, Amended Complaint at 40.)

Procedural Background

The initial Complaint was filed in this case in May, 2011, against the USFS, and two weeks later AWR filed a motion for temporary restraining order and preliminary injunction, seeking to enjoin the U.S. Forest Service from conducting helicopter hazing operations over the Gallatin National Forest lands in the Hebgen Basin. On June 6,

2011, this Court denied that injunctive relief, noting that the USFS did not conduct the helicopter hazing and was not the proper subject for the injunctive relief sought. (Doc. 13.) An Amended Complaint was filed on July 14, 2011, adding defendants APHIS, USFWS, NPS, and the executive director of the State of Montana Department of Livestock. (Doc. 19.) The administrative record was filed on October 31, 2011, and the Court set down a scheduling order for supplementation of the administrative record and cross-motions for summary judgment. Before that briefing began, however, on May 9, 2012, AWR filed another motion for temporary restraining order and a preliminary injunction seeking to restrain helicopter hazing in the Hebgen Basin area. (Doc. 45.)

Following hearing on this second emergency motion, the Court granted the motion for temporary restraining order on May 14, 2012, specifically for the purpose of permitting the Court to rule on the merits before any further helicopter hazing occurred. (Doc. 56.) At the hearing on the temporary restraining order, I stated that I was surprised that the helicopter hazing was continuing when the Court was in the middle of adjudicating the dispute and when Plaintiff contended in the Third Claim for Relief

that helicopter hazing violated NEPA. On May 24, 2012, the Court denied the motion

for preliminary injunction, stating that serious questions on the merits had justified the

issuance of the temporary restraining order, but that the need for injunctive relief no

longer existed. (Doc. 59.) On August 6, 2012, AWR filed its motion and brief in

support of summary judgment. On September 5, 2012, the federal Defendants filed

their cross-motion for summary judgment. By September, 2012, the federal defendant

National Park Service had conducted a new Biological Evaluation on helicopter hazing

of bison vis-a-vis grizzly bears, taking into consideration changes in nutrient sources

(such as whitebark pine nuts, cutthroat trout, and bison carcasses). (Doc. 97-2.) On

September 20, 2012, NPS reinitiated consultation with the U.S. Fish & Wildlife

Service ("FWS") pursuant to Section 7 of the ESA, 16 U.S.C. 1536(a). On

December 3, 2012, FWS completed that consultation with its letter to the NPS

concurring with the NPS conclusion that the use of helicopters to haze bison is not

likely to adversely affect grizzly bears.

Summary Judgment Decision

On March 26, 2013, this Court ruled on the parties' cross-motions for summary

judgment.  The Court dismissed two federal defendants, APHIS and FWS, which were only named in the ESA claims, due to the failure of AWR to name those defendants in its 60-day notice of intent to sue letter required by the ESA.  The Court found that the Section 7 (ESA) claim was moot due to the preparation by NPS of their 2012 Biological Evaluation and their reinitiation of consultation with FWS.  The Court also found that insufficient evidence supported AWR's Section 9 (ESA) claim against Christian Mackay, the Montana Department of Livestock's executive director, which alleged that the helicopter hazing of bison caused a taking or harassment of a threatened species under the ESA, the Yellowstone grizzly bear.  The FWS resident expert in Yellowstone Grizzly Bears stated flatly that occasional helicopter hazing is a non-issue and would not harm or harass bears or result in any measurable impact on grizzly bears or their cubs.  (Doc. 106 at 27.)  All the evidence showed that the helicopter hazing was infrequent, limited in duration, that hazing areas were not primary grizzly bear habitat, and that the protocol was to avoid hazing areas where grizzly bears were present.  In fact, the Yellowstone grizzly bear population continues to be healthy and increasing.

As to the Third Claim for Relief, AWR's NEPA claim, this Court found that AWR had failed to present new information that affected the environment in a significant manner or to a significant extent not already considered by the 2000 Final Environmental Impact Statement ("FEIS"). The FEIS contemplated that there would be some hazing of bison in the post-denning season, even into the summer months. (Doc. 106 at 36.) The evidence showed that helicopter hazing had a relatively neutral (neither beneficial nor adverse) impact on grizzly bears. This Court concluded that no new circumstances or information required a supplemental EIS as demanded by AWR. (Doc. 106 at 40.)

In its Fourth Claim for Relief, AWR presented a NFMA claim which asserted that helicopter hazing violated the Gallatin National Forest Plan. This Court found that helicopter hazing by a State of Montana helicopter was not carried out by the USFS and that the USFS issued no permit to allow it. No supplemental EIS was required because AWR failed to show (either directly, indirectly, or cumulatively) that helicopter hazing adversely impacts grizzly bears. (Doc. 106 at 43.)

Ninth Circuit Appellate Decision

On November 20, 2014, a Ninth Circuit panel affirmed the dismissal of APHIS and FWS for failure to provide ESA's required 60-day notice. *Alliance for the Wild Rockies v. U.S. Dept. of Agriculture, et al.*, 772 F.3d 592 (9th Cir. 2014). The court affirmed the grant of summary judgment to the federal defendants and dismissal of Montana on the ESA Section 7 claim, noting that "[r]einitiation of consultation is the precise relief sought by Alliance." (Doc. 120 at 19.) The panel affirmed the grant of summary judgment to the federal defendants and dismissal of Montana on the ESA Section 9 claim. The panel affirmed the grant of summary judgment to the federal defendants on the NEPA and NFMA claims. Noting that the helicopter hazing program was authorized, funded, or carried out, in whole or in part, by the federal defendants, the court reversed on standing, finding that AWR had adequately demonstrated causation and redressability as to its ESA and NEPA claims. Additionally, in a matter of first impression in the Ninth Circuit, the panel concluded that it was proper for AWR to send its ESA 60-day notice of intent to sue letter to the federal defendants, file its non-ESA complaint seven days later, and then amend its complaint to add the ESA claims after the 60-day notice period expired.

<u>Motion for Attorney Fees and Standards</u>

Clearly, AWR is not a prevailing party for purposes of their claims under NEPA and the NFMA.  AWR therefore brings its motion for attorney fees pursuant to its ESA claims and the pertinent standard supplied by the ESA: "The court . . . may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."  16 U.S.C. 1540(g)(4). Congress intended to expand eligibility for attorney fees from prevailing parties to *partially* prevailing parties having some success, if not major success.  *Ass'n of Cal. Water Agencies v. Evans*, 386 F.3d 879, 885 (9th Cir. 2004) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (interpreting similar 'whenever appropriate' Clean Water Act fee-shifting provision to require "some degree of success on the merits")).

The two-part test known as the Catalyst Test was stated in *Ass'n of Cal. Water Agencies v. Evans* as requiring the court to determine: (1) what was sought to be accomplished by the lawsuit; and  (2) whether any of the benefits sought were accomplished with a clear, causal relationship between the lawsuit and the desired

outcome. *Evans*, 386 F.3d at 885-86 & n.3. As to causation, it is necessary that the litigation be at least a contributing factor or played a role in influencing the desired outcome. The outcome accomplished must not be the result of a gratuitous act on the part of the government agency. *See Sablan v. Dept. of Finance of Commonwealth of N. Mariana Islands*, 856 F.2d 1317, 1327 (9th Cir. 1988). It is important to consider chronological events; although not always determinative, chronology may be used to reasonably infer that a defendant's actions have been prompted by the litigation. *See Braafladt v. Bd. of Governors of Or. State Bar Ass'n*, 778 F.2d 1442, 1444 (9th Cir. 1985).

Two years before the Ninth Circuit's catalyst test in *Evans*, a district court stated another method for determining eligibility for fee-shifting: the relief achieved "must have furthered the interpretation or implementation of the ESA." *EPIC v. Pacific v. Pacific Lumber Co.*, 229 F.Supp.2d 993, 1000 (N.D. Cal. 2002) (citing *Carson-Truckee Water Conservancy Dist. v. Secretary of the Interior*, 748 F.2d 523, 525 (9th Cir. 1984) (overruled on other grounds by *Marbled Murrelet v. Babbitt*, 182 F.3d 1091 (9th Cir. 1999)). However, *Carson-Truckee* carefully distinguished *eligibility* from *entitlement*,

stating that not all partially prevailing parties are *entitled* to a fee-shifting award, even though they may be eligible. "[U]nder the 'when appropriate' standard, an eligible party must make a substantial contribution to the *goals of a statute* to be entitled to attorney fees." *Carson-Truckee Water Conservancy Dist.*, 748 F.2d at 526 (emphasis supplied).

In this case, AWR's overarching objective was to obtain a permanent injunction against the helicopter hazing of bison back into Yellowstone National Park; that objective was not accomplished. An important step on the way to that objective was to prove that helicopter hazing effected a Section 9 take of grizzly bears within the meaning of the ESA; that objective was not accomplished. An alternative step was to demonstrate that a supplemental EIS should be prepared; that objective was not accomplished. There was limited success as to one of the Plaintiff's lesser goals of proving a Section 7 failure to reinitiate consultation with FWS; with regard to this claim, the Court infers that AWR did precipitate NPS's preparation of a new biological evaluation of the effects of helicopter hazing on grizzly bears and reinitiation of its consultation with USFWS, even though this Court ultimately dismissed as moot the

Section 7 claim.[1]  Federal defendants cite *Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 589 F.3d 1027, 1033 (9th Cir. 2009) (denying attorney fees under Equal Access to Justice Act) for the proposition that dismissal of a claim as moot deprives a party of entitlement to attorney fees.  However, *Klamath* is an EAJA 'prevailing-party' case, and the *Klamath* plaintiff did not prevail on the merits because the defendant BLM voluntarily withdrew its timber sale in response to new Ninth Circuit case law, not because any court enjoined the sale.  Therefore, the *Klamath* plaintiff was not a prevailing party under the EAJA standard.

The standard in an ESA case is not so very high, because even partial success may merit attorney fee compensation.  However, plaintiff in the instant case still had a very limited success because the conclusion of the biological evaluation and consultation supported the federal agencies' position and ultimately led to AWR failing

---

[1]  The Court notes that it is to be expected that the reinitiation of consultation required email communications between defense counsel in this case and FWS.  Information sharing between federal agencies during litigation is unremarkable and does not prove that the litigation itself prompted the reinitiation of consultation by NPS with FWS.

to achieve its ultimate objective--to stop helicopter hazing of Yellowstone bison.

In hindsight, it is relatively clear to this Court that Plaintiff had little justification for bringing this suit other than simple speculation that helicopter-hazing might harm or harass grizzly bears, combined with a belief that not enough formal analysis had been performed by the federal agencies. Ultimately, the evidence and the record in the case definitively showed that there was no harm. That said, the case would have been less clear absent the 2012 Biological Evaluation and the concurrence of the USFWS (completed in December, 2012), and it was not unreasonable for AWR to assert that insufficient formal analysis had been brought to bear on the question. In fact, NPS could have conducted its biological evaluation in 2011, immediately following receipt of AWR's 60-day notice of intent to sue, and had it done so then it would not be in the position of having to pay some of AWR's attorney fees now.

Considering all these circumstances, it seems to this Court that this partial success on the merits should be reflected in an appropriately limited award of attorney fees. The Court notes that after AWR's one limited success (accomplished by December, 2012), the case ground on with no further success for another four years.

15

AWR's reliance upon *Alliance for the Wild Rockies v. Krueger*, 2014 WL 46498 (D.

Mont. 2014), for the proposition that it is entitled to all its fees as to all its claims even

though it prevailed only on one ESA claim, is distinguishable. In *Krueger*, Alliance

achieved a permanent injunction against the Cabin Gulch Project based on its Section 7

ESA claim (lynx consultation), and all its claims were directed toward that goal. In the

*Kreuger* timber sale, "the injunction was the primary relief requested, as is often the

case in timber sale litigation." *Id.* at *2. Here, AWR failed to achieve its primary goal

and only had a partial success (only partial because the outcome of the consultation

favored the federal agencies' position) as to the ancillary consultation claim. There

was no material alteration in legal relationship between the opposing parties in this

case because neither the preliminary nor the permanent injunction sought by AWR was

granted.

Granting of TRO

AWR asserts that it achieved significant success in obtaining a two-week TRO

enjoining helicopter hazing of bison. This argument is without merit because the value

and significance of the TRO was negligible and was implemented mainly for the

convenience of the Court. Similarly, the Court doubts that AWR should receive the credit for APHIS's decision to withdraw its funding for Montana's helicopter hazing program. That defunding decision was a voluntary policy and budgetary decision not required by law. A gratuitous action by APHIS (which was dismissed from the litigation for lack of jurisdiction) should not be the basis for plaintiff's entitlement to attorney fees from the remaining federal agencies. And, again, the 2013 memorandum of understanding between the Montana Department of Livestock and the Montana Department of Fish, Wildlife & Parks, which governs the state protocols for avoidance of grizzly bears during state helicopter hazing operations, was a gratuitous and voluntary act not required by law (and also not relief sought by AWR).

Issuance of a temporary restraining order may support a fee award if it does "not merely preserve the status quo." *Envt'l Protection Information Center, Inc. v. Pacific Lumber Co.*, 229 F.Supp.2d 993, 1000 (N.D. Cal. 2002) (citing *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1161 (9th Cir. 2000) ("It is clear that the TRO in this case did more than preserve the status quo."). In this case, the Court issued a temporary restraining order on May 14, 2012, because serious allegations of dire threats to grizzly bears were

raised by Plaintiff, because the need for further helicopter hazing that year appeared to

be negligible, because the parties were ready to begin briefing a dispositive summary

judgment motion, and because the Court wished to preserve the general status quo (*i.e.*,

no helicopter hazing) while the Court examined the merits of the claims.  In fact, the

only helicopter hazing that was contemplated for the rest of the year was to occur the

very next day, on May 15, 2012.  During the TRO hearing, the undersigned was taken

aback and expressed surprise that hazing would be utilized when the hazing was itself

the subject of a pending complaint against the Montana Department of Livestock,

APHIS, the National Park Service, the U.S. Forest Service, and the U.S. Fish &

Wildlife Service, and the Court had not yet been able to evaluate fully the facts of the

case.  (Doc. 137, TRO Hearing, 54:11-55:6.)  The state defendant, Christian Mackay,

testified that there had been two days of helicopter hazing that year (May 9, 11, 2012),

and the state intended to helicopter haze on the next day (May 15, 2012) in order to

move the last 70 head of bison back into Yellowstone National Park.  (Doc. 137, TRO

Hearing, 75:18-22, 76:4-9, 77:3-5.)   However, Mr. Mackay also testified that there

were at least three alternatives (horseback hazing, capture, or lethal removal) available

for the next day (May 15, 2012) if helicopter hazing were to be enjoined.  (Doc. 137,

TRO Hearing, 91:3-18.)

The Court granted the TRO because the Court wanted the status quo of no-

hazing in place to enable the Court and the parties to turn their attention to dispositive

motions (scheduled to be filed imminently).  The TRO was a relatively unimportant

matter, as it turned out, because it pertained only to the activities of the next day.

Similar to the circumstances in *Sole v. Wyner*, 551 U.S. 74 (2007) (a prevailing-party

fees case), the granting of the TRO in this case was an "ephemeral" victory for AWR,

because AWR won the TRO battle--only because the Court wanted to turn its attention

to the merits of the case and little was to be gained or lost by the issuance of a

TRO–but lost the war.  *Id.* at 86.  The State of Montana continues to maintain its right

to conduct helicopter hazing of Yellowstone bison, and the federal agencies continue to

maintain that helicopter hazing is a valid bison management tool that may affect, but is

not likely to adversely affect, the threatened grizzly bear.  Although AWR leveled

serious allegations of mismanagement of the helicopter hazing of bison vis-a-vis the

grizzly bear, *see* Doc. 59, Order dated May 24, 2012, at 2, the Court ultimately

determined that those allegations were not supported by sufficient evidence for issuance of either a preliminary or permanent injunction, *see* Doc. 106 at 39.

Interpretation of ESA's 60-Day Notice Statute

AWR also asserts that it is eligible for and entitled to attorney fees for the ESA precedent set by the Ninth Circuit in its decision in this case. Reversing this Court in a matter of first impression, the Ninth Circuit panel decided that it was permissible for AWR to send the federal agencies its 60-day notice of intent to sue letters but then seven days later file its original complaint alleging non-ESA claims, with the plan to amend its complaint to add ESA claims after the 60-day period had elapsed. *Alliance for the Wild Rockies v. U.S. Dept. of Agriculture*, 772 F.3d at 603. However, this Ninth Circuit interpretation of the ESA arose in response to the *federal agencies' argument* and did not arise as any part of AWR's claims themselves.

No doubt the 60-day notice ruling provides a helpful clarification for environmental law practitioners because it lays down a clear rule of engagement that assists practitioners in planning and executing litigation strategy, and particularly in allowing plaintiffs to bring motions for emergency relief on non-ESA claims if they

have them.  Necessary clarifications of statute and refinements of case law are a regular and expected occurrence.  However, this procedural clarification did not make a substantial contribution to the dominant goals of the ESA (*viz.*, protection of endangered species by, among other things, requiring that federal agencies consult with the Fish and Wildlife Service or the National Marine Fisheries Service before taking any action that might threaten a listed species).  Not only is this interpretation of the ESA purely procedural, rather than substantive, but also this 'success' does not satisfy the first prong of the catalyst test because it was merely a by-product of the litigation and not among the goals sought to be achieved by AWR's litigation.  This type of useful but unintended consequence of litigation does not entitle AWR to attorney's fees.  Assuming, *arguendo*, that this 'success' on a procedural clarification of ESA makes AWR eligible for attorney fees, it does not necessarily follow that AWR is entitled to attorney fees, and in the opinion of this Court it does not.

AWR supplements its partial-success argument with the assertion that it *had* to appeal the 60-day notice issue or else it could never have become a prevailing party, and therefore it should receive all of its attorney fees on appeal.  However, AWR did

not become a prevailing party on appeal. The Court returns to the fact that AWR achieved no substantive benefit or success by its appeal, because the federal defendants had completed its reinitiated consultation (mooting the Section 7 claim) three months before AWR's notice of appeal was filed. Viewing the appeal by what it actually, substantively accomplished for a threatened species under ESA, the Court finds it not to be appropriate to award AWR's attorneys fees on appeal.

Billing Rate and Hours

In determining the amount of fees that are reasonable, the Court uses the lodestar method (the number of hours reasonably expended times a reasonable hourly rate). The Court also considers the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to the acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). Plaintiffs may

receive fees for their unsuccessful claims if they are based on "a common core of facts or are based on related legal theories," but the court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (U.S. 1983). In this case, Plaintiff did not obtain an excellent result, Plaintiff's sole successful claim did not achieve the primary objective of the litigation, and even that successful claim was only partially successful, in that the final result of the Section 7 consultation did not support Plaintiff's primary objective.

The Court considers reasonable hourly rates in view of experience, reputation ,and skill, as well as the "prevailing market rates in the relevant community, which typically is the community in which the district court sits." *Schwarz v. Secretary of Health & Human Services*, 73 F.3d 895, 906 (1995). In this case, the Court limits the relevant community to environmental attorneys in Montana with commensurate experience, reputation, and skill. The Court concludes that Smith and Bechtold's

billing rates are reasonable, as they have been awarded these billing rates in prior cases in the District of Montana. In 2013, Smith was awarded $210/hour for work performed in 2011 and $220/hour for work in 2012, and Bechtold was awarded $270/hour for work performed in 2011 and $280/hour for work in 2012. *Native Ecosystems Council v. Weldon*, 921 F.Supp.2d 1069, 1080 (D. Mont. 2013) (CV 11-99-M-DWM) (awarding $46,436 in attorney fees). More recently, in 2014, Smith was awarded $220/hour for work in 2012, and $230/hour for work in 2013, and Bechtold was awarded $280/hour for work performed in 2012, $290/hour for work performed in 2013. *Alliance for the Wild Rockies v. Krueger*, 2014 WL 46498 (D. Mont. 2014) (CV 12-150-M-DLC) (awarding $72,234.55 in attorney fees).

Reviewing this case with the benefit of hindsight, the Court finds that the case was probably brought not to protect a threatened species (the grizzly bear) but to attempt to force the multiple government actors to stop hazing Yellowstone bison back into the Park. A USFS finding of no significant impact and special permit allowing helicopter hazing of bison had been approved previously by this Court and also by the Ninth Circuit Court of Appeals. *See Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir.

2004).  Plaintiff knew, or should have known, of this circuit approval before embarking

on this case.  That said, whenever a citizen suit identifies a governmental failure to

follow strictly the requirements of the ESA, the suit serves a public purpose.

Therefore, the Court finds that it is appropriate to award attorney fees to AWR for

hours performed beginning with the drafting of the amended complaint through the

completion of consultation between NPS and USFWS:

Smith
$ 7,023.00 (2011)   (158.6 total hours in 2011 minus 123.7 hours prior to 7/13/11)
$42,108.00 (2012) (191.9 total hours in 2012 minus .5 hours after 12/4/12)
$11,362.31 (fee petition)

Bechtold
$ 9,642.00 (2011) (63.9 total hours in 2011 minus 28.3 hours prior to 7/14/11)
$30,044.00 (2012) (unadjusted)
$3,660.82 (fee petition)

(Doc. 132-5 at 6-7; Doc. 132-4 at 4-5.)  This results in total attorney fees of

$103,840.13.

    The Court need not analyze the fee requests line-by-line, *see In re Smith*, 586

F.3d 1169, 1174 (9th Cir. 2009), but there are some entries that do appear unreasonable.

The Court concludes that a reduction should be applied to the foregoing total amount

of attorney fees to account for vague and unclear billing records that fail to identify the nature of work to tie it to the one successful claim, excessive hours spent conferencing between co-counsel and preparing the fee petition, billing time spent on clerical and administrative tasks and trips to Yellowstone National Park, and billing for community organizing, conferencing with non–parties, and drafting/reviewing press releases. The Court finds that a twenty-five percent reduction in attorney fees is appropriate. With this reduction, total attorney fees are reduced to $77,880.10.

Expert Witness Fees and Other Costs and Expenses

Defendants concede that if any costs are appropriately awarded to AWR, they are the costs incurred between the filing of the amended complaint and the reinitiation of consultation on May 12, 2012, for a total of $459.10 in filing fee, copying, and mailing expenses. (Doc. 131, Defs.' Brief in Response at 46.)

Defendants object to the request of a $3,960.00 payment for Mr. Darrell Geist as a research assistant/consultant. AWR seeks a billing rate for Mr. Geist of $75.00 per hour for 52.8 hours, for a total request of $3,960 for "research assistant/consultant fees." (Doc. 132-5 at 7.) Mr. Geist has a B.A. in Political Science from South Dakota

State University.  (Doc. 132-5 at 4.)  Throughout this litigation he was employed by Buffalo Field Campaign, a nonprofit organization devoted to protecting the Yellowstone National Park bison.  (Doc. 131 at 38.)  Mr. Geist was working for Buffalo Field Campaign while it was issuing press releases concerning helicopter hazing and this litigation and while Buffalo Field Campaign was assisting counsel with video and documentation.  (Doc. 131 at 38.)  Defendants assert that Geist should not be paid for his work that appears to be in the course of his ordinary employment with the Buffalo Field Campaign, and this Court agrees.  (Doc. 131 at 38.)  Furthermore, Mr. Geist is not a lawyer and is not a scientist, and he has no expertise that is credentialed outside of his experience as an employee of the Buffalo Field Campaign.  AWR points out that Mr. Geist has completed one semester of paralegal studies at the University of Montana-Missoula College, with a 4.0 average.  While this is commendable in itself, it does not justify compensation at the requested rate of $75.00 per hour.  Much of the time billed is outside of the amended complaint/reinitiation-of-consultation parameters, much of the time billed is for administrative activities, some of the time billed is for work relating to a suit against the State of Montana, and none of the time billed is

27

related to any particular claim. Under all these circumstances, the Court declines to award AWR expenses associated with an untrained research assistant/consultant when he is already being paid for all or part of this work for his employer Buffalo Field Campaign.

Defendants object to AWR's request for expert opinions relating to the reasonableness of the hourly rates requested by Smith and Bechtold. The court agrees that seven fee experts, charging $4,785.00 (Doc. 132-5 at 7) is excessive, especially given that Smith and Bechtold have already received these billing rates in cases before two other Montana federal district judges. Such inordinate multiplication of attorney fee expert opinions should not be encouraged, lest it become a minor industry unto itself. The Defendants point out that Dana Johnson's expert fee opinion is the same fee opinion rendered for Smith and Bechtold three months earlier in *Swan View Coalition, et al., v. Chip Weber, et al.*, CV 13-129-M-DWM. (Doc. 125 at 89.) Very few words have been changed before this expert fee opinion was resubmitted in this case, and it apparently escaped notice that <u>this</u> case is not a "politicized federal timber sale" case. (Doc. 125 at 91.) This request for $357 for a duplicate expert fee opinion is outlandish.

The Court will grant the request for attorney fee expert opinions in the total amount of $500.

The Court finds itself in agreement with the Defendants that the expenses for 60-day-notice expert opinions are not compensable. As explained above, the 60-day notice issue was not a claim in Plaintiff's amended complaint and does not promote the dominant goals of the ESA, so Plaintiff is entitled to neither attorney fees nor expert opinion expenses for this issue. Accordingly,

IT IS HEREBY ORDERED that Plaintiff's Motion for Attorney Fees and Costs is granted in part and denied in part, as follows:

| | |
|---|---|
| Ms. Smith: | $45,369.98 |
| Mr. Bechtold: | $32,510.12 |
| Costs: | $ 459.10 |
| Expert Fees: | $ 500.00 |
| Total: | $78,839.20 |

Dated this 13th day of September, 2016.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE